[Civ. No. 45778. Second Dist., Div. Five. Sept. 15, 1976.]

LOS ANGELES COUNTY EMPLOYEES ASSOCIATION, SEIU LOCAL 660, AFL-CIO, Plaintiff and Appellant, v. COUNTY OF LOS ANGELES et al., Defendants and Respondents.

[Civ. No. 46996. Second Dist., Div. Five. Sept. 15, 1976.]

LOS ANGELES COUNTY EMPLOYEES ASSOCIATION, SEIU LOCAL 660, AFL-CIO et al., Plaintiffs and Appellants, v. COUNTY OF LOS ANGELES et al., Defendants and Respondents.

## COUNSEL

LeMaire, Faunce & Katznelson, Cy H. LeMaire and Mark Ellis Singer for Plaintiffs and Appellants.

John H. Larson, County Counsel, Daniel C. Cassidy and Joe Ben Hudgens, Deputy County Counsel for Defendants and Respondents.

## OPINION

KAUS, P. J.—Petitioners, certain Los Angeles County employees and their union, appeal from judgments in favor of the County of Los Angeles and various County officials (defendant County), after the trial court denied petitions for writ of mandate. This appeal involves two actions filed separately but consolidated for hearing and on appeal, apparently because the parties agree that the issues in both cases are the same.[1]

### FACTS

Petitioners are County tractor operators and their union, and the union on behalf of County nursing employees. (*Ante,* fn. 1.) Their basic grievance is that the job classifications of both groups of employees were downrated.

[1]Petitioners in 2d Civil No. 46996 are tractor operators employed by the County and SEIU Local 660, AFL-CIO. In September 1971 they filed a complaint for an injunction, challenging a job reclassification rule that would reduce in rank some but not all of the operators. After being denied an injunction, their action lay dormant until December 1973, when they moved for a writ of mandate on behalf of those operators who were in fact reduced in rank. Petitioner in 2d Civil No. 45778 is SEIU Local 660, on behalf of County nursing employees, who were reduced in rank based on a reclassification of their jobs. That petition for writ of mandate was filed several days after the tractor operators moved for a writ.

### The Tractor Operators

Sometime before July 21, 1971, the Los Angeles County Director of Personnel conducted studies of the utility tractor operator (UTO) positions and recommended to the Los Angeles County Civil Service Commission that the positions be reclassified, chiefly to the lower position of light tractor operator (LTO). On July 21, 1971, the civil service commission approved the recommended reclassifications.

On August 19, 1971, all 28 UTOs were notified by letter that the study resulted in 21 men "being reclassified to a new position of Light Tractor Operator effective October 1, 1971." The letter explained that only six of the remaining UTO positions were funded and those six positions would be filled by "the 6 senior qualified Utility Tractor Operators in the Department." Those employees who elected to accept the reduction from UTO to LTO would "have their salaries frozen October 1, 1971."[2]

The letter further informed the tractor operators that they "must" indicate whether they would accept the reduction and that the choice would not preclude them "from requesting a review by the Director of Personnel." They had to submit their "decision . . . by Friday, August 27, 1971." Requests for review had to be "made in writing" within 30 days of receipt of the notification.

Apparently all of the affected tractor operator employees accepted the reduction in rank. None of them requested review by the director of personnel. Rather, an action for injunctive relief was filed on September 30, 1971 (*ante,* fn. 1). Relief was denied in November 1971.

### The Nurses

Sometime before April 23, 1973, the director of personnel conducted a study of the classification of nursing employee positions and recommended to the civil service commission that certain of those positions be reclassified. The commission held hearings on April 23 and 30, 1973, and approved the reclassification on May 23, 1973.

The affected employees were notified by letter about the reclassification, which was to be effective August 1, 1973. They were informed that

---

[2]The County's rules provide for a so-called "Y rate," under which an employee whose position is reclassified to a lower level continues "to receive the same salary received immediately prior to the reclassification or salary schedule reduction."

they would be required to decide whether to accept the reduction by August 1 and that they could request the director of personnel to review the findings. The letter described the review and appeals procedure.

Over 200 nursing employees affected by the reclassification sought review of the classification under civil service commission rules. At the time this action was heard, the review had not yet been completed.

### The County Rules

Rule 6 of the Los Angeles County Civil Service Commission rules provides generally for classification of all positions within the county civil service system. Rule 6.01 sets forth the standards for job classification. Rule 6.03(d) provides that when the director of personnel "has completed his classification findings he shall report and certify to the Commission that his findings were based on specifications established by the Commission . . . ." If the commission does not approve of changes, it may refer them back to the director of personnel or set them for hearing.

Rule 6.02(b) also contains a provision for commission hearings at the request of interested parties before commission approval of the director's report and findings. The UTOs had failed to request such a hearing before the July 21, 1971 reclassification. The nurses apparently did request a hearing, since, as noted, one was held on April 23 and 30, 1973, at which hearing they appeared and expressed their views.

Rule 6.04 provides for two-stage administrative "reviews and appeals" as follows:

"Any employee . . . affected by any classification action may request the Director of Personnel to review such action. Such request for review . . . shall be made in writing within 30 days of notification of such action. . . . After notification of the results of such review by the Director of Personnel the employee . . . may appeal therefrom to the Commission. Such appeal shall be made not later than ten business days after date of notification of results of review and shall be made in accordance with Rule 5."[3]

### Petitioners' Allegations

Petitioners alleged, first, that the commission has unlawfully delegated the task of reclassification to the director of personnel, and, second, that

---

[3]Rule 5 sets forth the procedure for hearings before the commission.

it has failed to implement section 34(10) of article IX of the Los Angeles County Charter which, they claim, confers on county employees who are laid off or reduced without fault an·absolute right to be reinstated to their former positions within one year.

The County denied any illegality and affirmatively alleged that petitioners were barred from judicial review because they had not exhausted their administrative remedies.

The trial court made findings of fact and conclusions of law. It concluded that neither the tractor operators nor the nurses had exhausted their administrative remedies, but also ruled on the merits of petitioners' legal assertions and found that the commission had not unlawfully delegated its duties under the charter, and that the commission had adopted rules consistent with the duty imposed on them by the County charter.

## DISCUSSION

None of the tractor operators sought administrative review of the reclassification. Some of the nursing employees did, but filed legal action before the review was complete. All contend that there is no adequate administrative remedy afforded to any employee who has been reclassified.

Petitioners recognize the rule that "a party must exhaust his administrative remedies prior to seeking relief in the courts. [Citations.]" (*Martino* v. *Concord Community Hosp. Dist.,* 233 Cal.App.2d 51, 56 [43 Cal.Rptr. 255].) They rely on the exception: "However, this rule has no application in a situation where an administrative remedy is unavailable or inadequate. [Citations.]" (*Id.*)

■ Petitioners claim the administrative remedy is inadequate for several reasons. First, they point out that the tractor operators were notified of the reclassification on August 19, and required to seek administrative review by about September 18, although, in fact, no one of the tractor operators would know until September 27 whether they were, in fact, affected by the reclassification.

It is true that the letter to the tractor operators informed them that if any operator did "not accept the classification findings," the request for review by the director of personnel "must be made in writing . . . within

30 days of your receipt of this notification." At worst, this requirement meant that, because six operators would not be adversely affected by the reclassification, any protest would become moot. The operators were informed that a willingness to accept a reduction would not "preclude" them from "requesting a review," and, thus, would not have been harmed by any protest that turned out to be unnecessary.

Moreover, the original action for injunctive relief was filed on behalf of all the tractor operators, indicating that at least part of the disagreement was with the reclassification of *any* tractor operator. To the extent that the tractor operators opposed the reclassification, there would have been nothing futile in requesting a hearing on that issue within the time limits required by the county.

■ Petitioners, essentially asserting their claim on the merits, contend that the administrative remedy is inadequate because the director of personnel does not submit to the commission a "report of facts as to why certain classification actions have been taken" and the "employee, therefore, is left with *nothing* upon which to base an appeal initially to the Director of Personnel."

Petitioners' argument is based on a curious misreading of the holding in *Schecter* v. *County of Los Angeles,* 258 Cal.App.2d 391 [65 Cal.Rptr. 739]. There the court nullified a refusal of the board of supervisors to implement a reclassification by the commission which was not concurred in by its staff. The board's refusal was, apparently, based on the patently erroneous theory that the commission's only function was a ritual rubberstamping of the staff's decisions. Although after *Schecter* the commission amended its rules on reclassification to differentiate more clearly between the staff's function and that of the commission, petitioner claims that it is still rubberstamping the staff's recommendations in making its initial determinations to reclassify.

Just why this should make administrative review useless is not explained. Even if a particular finding by the director is erroneously rubberstamped by the commission, one of the purposes of the review and appeal procedure set forth in rule 6.04 is to give the commission a chance to mend its ways by doing its job properly.

In any event, the record does not support the assertion that somehow since *Schecter,* the commission has abandoned its independence of

judgment and come to share the Board's erroneous view that its functions are ceremonial. Assuming that staff recommendations on reclassifications that are not opposed by affected employees under rule 6.02(b) are routinely approved, nothing indicates that these recommendations do not follow the commission's guidelines. Surely the commission may assume that its directives have been followed, particularly where no objection to the staff findings is voiced. We know from this very record that when the nurses did object, the commission held two days of hearings at which they aired their grievances.

Petitioners' second reason for not seeking administrative review is even weaker. They argue that because the first-stage review by the director under rule 6.04(a) might result in a change without action by the commission, the review procedure is an unauthorized delegation of the commission's discretion. Even if it is a legitimate argument that an affected employee need not seek administrative relief because, if granted, it would be tainted, the argument does not explain petitioners' failure to appeal to the commission itself, as was their privilege under rule 6.04(b).

Finally, petitioners' reliance on *Endler* v. *Schutzbank*, 68 Cal.2d 162 [65 Cal.Rptr. 297, 436 P.2d 297], is misplaced. There the hearing offered by the commission was " 'an informal hearing' " which was " 'not undertaken pursuant to any . . . statutory authority, . . . not to be in accordance with administrative procedures . . .' " and would have been held " 'without prejudice to the rights of the parties . . . .' " (68 Cal.2d at p. 167.) In those circumstances, the court held that the exhaustion of remedies doctrine does not apply where a "manifestly defective" hearing is proposed. (*Id.,* at p. 168.)

Petitioners cannot and do not contend that the review and appeal provided by commission rules is "manifestly defective" in the sense used in *Endler*.[4] ■ Rather, they point out that the nursing positions were reclassified effective July 13, 1973; that 225 nurses requested review and that, as of January 15, 1974, only 2 of those requests for review had been acted on by the director and appealed to the civil service commission.

---

[4]Such an assertion would be frivolous in face of the meticulous procedures set forth in section 5, rules 5.01 through 5.16.

That the director of personnel and the commission have not processed 225 requests for review filed at about the same time within 7 months, is, without more, not grounds to assert that the administrative remedy is inadequate. Petitioners make no showing that other administrative boards work with greater dispatch under comparable circumstances. Moreover, the record does not indicate to what extent the delays are attributable to the nurses or the petitioning union or the pendency of this very litigation in which petitioners assert—for reasons other than delay—that the administrative review can be bypassed.

Finally, assuming that the nursing employees sought administrative review in good faith, it is not clear why, legal entitlement aside, each employee needs a separate hearing on matters which petitioners otherwise claim affect all such employees.[5]

In brief, petitioners have provided no justification for failing to exhaust the administrative remedies provided by the rules of the Los Angeles County Civil Service Commission.

We are, therefore, quite convinced that as far as petitioners' grievances against their reclassifications are concerned, the failure to exhaust administrative remedies forecloses them from arguing the merits.[6] Reasonable minds can, however, differ on whether the commission's alleged failure to implement section 34(10) of article IX of the County charter could have been attacked by the administrative remedies provided in the commission's rules. We therefore discuss that issue on its merits.

■ Section 34 of article IX of the charter provides that the commission shall make rules ". . . (10) . . . for reinstatement within one year of persons who without fault or delinquency on their part are separated from the service or reduced."

---

[5]Civil service commission rules permit class action appeals if requested by "two or more" appealing persons. (§ 5.16.) We do not know whether the nursing employees requested such a class action hearing.

[6]As we recognized in the text, the argument on the merits and the argument why administrative review is inadequate, intertwine. If our discussion on the adequacy of administrative review appears to dispose of the merits as well, so be it.

The commission has implemented section 34(10) in a variety of ways. Rules 6.05(b), 18.01, 18.02, 20.08, and 20.09, all quoted below,[7] are a more than adequate implementation of the mandate of the charter. Petitioners' disagreement rests simply on their interpretation of section 34(10) as compelling the re-employment of employees who are laid off or reduced: In their view, section 34(10), in effect, mandates a one-year moratorium on over-employment.[8] If that interpretation of the charter is correct, it would be self-executing and no implementation necessary.[9]

---

[7]Rule 6.05(b) reads as follows: "(b) Whenever a position is reclassified from one class to a lower class the incumbent may elect to retain the position in the lower class. If the incumbent declines to retain the position in the lower class, a layoff list shall be created and the position filled by demotion in lieu of layoff in accordance with the provisions of Rule 20. Any person demoted involuntarily to fill a position reclassified downward shall be placed on a re-employment list in accordance with the provisions of Rule 20."

Rule 18.01 reads as follows: "*Reinstatement After Separation.*

"After approval by the Director of Personnel, any person who has been separated from County service, without fault or delinquency, may be reinstated by the appointing power within one year from the date of such separation, to any position he had held on an eligible basis prior to such separation or to any other position to which his transfer or reassignment from that position would be authorized by these Rules. (Effective July 13, 1967)"

Rule 18.02 reads as follows: "*Rights Restored.*

"Upon reinstatement all rights acquired by an employee prior to his separation from the service shall be restored except as otherwise provided in Rule 13.01 and in the County Salary Ordinance. (Effective January 29, 1973)"

Rule 20.08 reads as follows: "*Re-employment List.*

"The names of persons laid off or reduced in accordance with these Rules shall be entered upon a list in the inverse of the order specified in Rules 20.03 and 20.04, except that persons whose records of employment have not been satisfactory shall be omitted from the Re-employment List. Lists from different departments or at different times for the same class of position shall be combined into a single list. Such list shall be used by every appointing power when a vacancy arises in the same or lower class of position, before certification is made from an eligible list. When a vacancy occurs the appointing power shall appoint the person highest on the Re-employment List who is available who was laid off from a position in that department. If no one was laid off from the department in which the appointment is to be made, then the appointing power shall appoint any one of the first three persons named on such list. If only two names are on the list, he shall appoint one of such persons; if only one, he shall appoint that one."

Rule 20.09 reads as follows: "*Name Dropped.*

"Names of persons laid off or reduced in lieu of layoff shall be carried on a Re-employment List for two years, except that the names of persons appointed to permanent positions of the same level as that from which laid off shall, upon such appointment, be dropped from the list. Persons reduced or re-employed in a lower class or re-employed on a temporary basis shall be continued on the list for the higher position for two years."

[8]The charter does not distinguish between separations from service and reductions.

[9]Petitioners rely on *Forstner* v. *City etc. of San Francisco,* 239 Cal.app.2d 516 [48 Cal.Rptr. 805], which involved an interpretation of section 141 of the San Francisco Charter which provided: "The allocation or re-allocation of a position shall not

We agree with the county counsel that petitioners' interpretation of section 34(10) is "absurd." Reasonably interpreted, the section means that if an employee is separated or reduced without fault and there is an opening for which he is qualified within one year, he should have an opportunity to regain his former position. The rules quoted in footnote 7, *ante,* more than implement that interpretation in that they extend the period to two years.

The judgments are affirmed.

Ashby, J., and Hastings, J., concurred.

---

adversely affect the civil service rights of an occupant regularly holding such position." (*Ibid.,* at p. 520.) The court merely held that a civil service commission interpretation of section 141 which continued the salary level of employees in an outdated classification, did not violate section 151 of the charter which required "like compensation for like service . . . ." (*Ibid.,* at p. 523.) It seems clear that *Forstner* merely upheld the San Francisco commission's interpretation of section 141 of the charter to provide relief similar to the Los Angeles "Y rate" of pay (See fn. 2, *ante*) which petitioners are receiving. In any event, *Forstner* certainly does not hold that the Los Angeles Charter provision which concerns itself with layoffs as well as reductions, must be interpreted as petitioners contend.